## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**RICHARD ALAN DAVIS**                                                  **PLAINTIFF**
**ADC #89568**

**v.**                                   **No: 2:20-cv-00147 JM-PSH**


**GAYLON LAY,** *et al.*                                              **DEFENDANTS**


## PROPOSED FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following proposed Partial Recommendation has been sent to United States District Judge James M. Moody, Jr.  You may file written objections to all or part of this recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this recommendation.  By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

Plaintiff Richard Alan Davis, an inmate confined at the East Arkansas Regional Unit of the Arkansas Division of Correction (ADC), filed this *pro se* 42 U.S.C. § 1983 action on July 15, 2020 (Doc. No. 2).  Davis filed an amended complaint on August 13, 2020 (Doc. No. 7).  In his amended complaint, Davis alleged that Warden Gaylon Lay, Deputy Warden Emmer Branch, Deputy Warden

James Dycus, Major Randy Shores, Major Kenyon Randall, and Field Major Jeffery Deen ordered the use of chemical spray on non-combative inmates, including Davis, on April 14, 2020, which caused Davis difficulty breathing and seeing. Davis' claims against Shores, Randall, and Deen were previously dismissed for failure to exhaust administrative remedies. *See* Doc. Nos. 47-48. His claims against Lay, Branch, and Dycus (the "Defendants") remain.

Davis filed a motion for summary judgment, a brief in support, affidavit, and statement of facts (Doc. Nos. 76-79), and Defendants filed a response (Doc. No. 92). The Defendants also filed a motion for summary judgment, a brief in support, and a statement of facts (Doc. Nos. 93-95). Davis filed a response, a brief in support, and a statement of facts in response to their motion (Doc. Nos. 101-103). For the reasons set forth in this Recommendation, the undersigned recommends that the Defendants' motion for summary judgment be granted and Davis' motion be denied.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir.

2002). The nonmoving party may not rely on allegations or denials, and must instead demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III. Facts

The facts of this case are largely undisputed. A disturbance began in Davis' barracks on the night of April 13, 2020, and continued into the morning hours of April 14, having spread to three other barracks. A small number of inmates, not including Davis, were making demands and engaging in destructive behavior, such as throwing batteries and breaking windows. After several hours of negotiations with these inmates, and after the inmates had blocked entrance to the barracks and flooded it with soap and water, an emergency response team led by Major Randy Shores released chemical spray in Davis' barracks. Davis does not specifically dispute that Shores, who is no longer a defendant in this case, made the decision to use chemical spray. *See* Doc. No. 101 at ¶15. He testified that he believes Warden

Gaylon Lay was in charge of the command center and that Deputy Warden James Dycus and Deputy Warden Emmer Branch were in agreement with the decision to use chemical spray; he offers no evidence to support that belief. The only specific facts disputed by Davis concern whether the inmates were given a warning or opportunity to leave the barracks before chemical spray was used. *See* Doc. No. 101 at ¶¶11-15.

The following relevant facts provide the context necessary to analyze Davis' claims. They are taken from Davis' amended complaint (Doc. No. 7) ("*Amended Complaint*"), the Defendants' statements of undisputed facts (Doc. No. 95),[1] and the following documentary evidence:  Davis' deposition testimony (Doc. No. 93-1) (the "*Davis Deposition*"); the declaration of Randy Shores (Doc. No. 93-2) (the "*Shores Declaration*"); the Declaration of Gaylon Lay (Doc. No. 93-3) (the "*Lay Declaration*"); the Declaration of James Dycus (Doc. No. 93-4) (the "*Dycus Declaration*"); the Declaration of Emmer Branch (Doc. No. 93-5) (the "*Branch Declaration*"); and Grievance EA-20-00609 (Doc. No. 93-10).  The few facts disputed by Davis in his statements of disputed facts (Doc. Nos. 79 & 103) are noted. In support of his motion and response to the Defendants' motion, Davis submitted three witness statements not made under penalty of perjury:  Eric Frankenhauser's

---

[1] Davis has not submitted a statement of undisputed facts; rather, he has filed what he contends are a list of disputed facts.  *See* Doc. Nos. 79 & 103.

witness statement (Doc. No. 5 at 1-3); Robert Mitchell's witness statement (*id.* at 4-8); and Anthony Toombs' witness statement (*id.* at 9). He also submitted several incident reports that describe the April 13-14, 2020 incident; the ADC's policies on use of force and chemical agents; and various photos related to the incident. *See* Doc. No. 78 at 5-17; Doc. No. 102 at 16-33.

1. On April 13-14, 2020, Davis was assigned to, and physically present in, in, the EARU's 8 barracks. *Amended Complaint* at ¶2; *Davis Deposition* at 8 & 10.[2]

2. On April 13, 2020, at approximately 10:30 p.m., Captain Undray Fields, a non-party in this lawsuit, called Lay and advised him that a group of inmates in the EARU's 8 barracks were complaining about the chow process taking longer than normal and that the barracks' televisions were on too late. *Lay Declaration* at ¶ 3; *Amended Complaint* at ¶11.

3. Lay received another call from Fields at approximately 11:30 p.m. Fields advised Lay that the group of inmates in 8 barracks were becoming angrier and more volatile and that they had started destroying state property inside the

---

[2] Deposition page numbers refer to the page of the deposition, not the EM-ECF docket page number.

barracks.[3] Fields also reported that inmates in barracks 1, 2, 7, and 8 were refusing to allow staff to enter. *Lay Declaration* at ¶ 5.

4.      Because Lay lived close to the unit, he arrived within minutes to assess the situation. At approximately 11:47 p.m., Lay and Dycus arrived at the unit. *Lay Declaration* at ¶ 6; *Dycus Declaration* at ¶ 3.

5.      Dycus immediately reported to 8 barracks and began to speak with the group of inmates who were creating the disturbance. He primarily spoke directly with inmate Antonio Hernandez, who appeared to be the ringleader of the disturbance. *Dycus Declaration* at ¶ 4. *See also Amended Complaint* at ¶ 13.

6.      After listening to the inmates' grievances and demands, Dycus gave a clear direct order to all inmates in 8 barracks to catch their racks and allow staff to enter the barracks. Several inmates in the barracks were on their racks or went to their racks. *Dycus Declaration* at ¶ 6; *Amended Complaint* ¶ 14.

7.      Davis maintains that he was in compliance with Dycus' order and stayed on his rack. *Amended Complaint* at ¶ 15.

_____

[3] In April 2020, the EARU had implemented several policies and procedures to address the COVID-19 pandemic. The unit sought to separate large groups of inmates in attempt to prevent a large-scale outbreak of COVID-19. One of these new policies, taken out of the safety concerns for inmates and staff, prolonged the chow process because each barracks was served food separately. *Lay Declaration* at ¶ 4.

8.      Some inmates in 8 barracks refused to comply with Dycus' direct order. *Dycus Declaration* at ¶ 7; *Amended Complaint* ¶ 14.  Inmate Hernandez told Dycus that catching their racks was not "going to happen." *Dycus Declaration* at ¶ 7.

9.      During Dycus' interaction with inmate Hernandez at 8 barracks, inmates in 8 barracks, and in barracks 1, 2, and 7, broke out windows with locks, batteries, and other items. *Dycus Declaration* at ¶ 9.

10.     Dycus advised Lay of the inmates' grievances and demands and that inmates were continuing to damage state property. *Dycus Declaration* at ¶ 10; *Lay Declaration* at ¶ 7.

11.     Lay then reported to 8 barracks in an attempt to defuse and resolve the situation for the safety of the EARU's inmates and staff.  Inmate Hernandez restated his grievances and demands to Lay, and inmates in 8 barracks continued to refuse all direct orders to catch their racks and allow staff to enter. *Lay Declaration* at ¶ 8.

12.     Per ADC protocol, the unit's warden cannot respond to a disturbance situation.  The warden must remain in a position of command and must continue to oversee the operation of the rest of the facility.  Once the situation at 8 barracks escalated, Lay returned to his office and determined outside assistance was needed to resolve the disturbance and to regain control of the barracks. *Lay Declaration* at ¶ 9.

13.    Lay called Shores, who is no longer a defendant in this lawsuit, and advised him of the situation. *Lay Declaration* ¶ 10; *Dycus Declaration* at ¶ 11. Shores is the Emergency Preparedness Administrator/Major[4] at the ADC, and he is also the commander of the Central K9 Unit ("Central K9").[5] *Shores Declaration* at ¶ 2.

14.    Lay also notified Deputy Director William Straughn, Raymond Naylor, and Dina Tyler before opening the command center. *Lay Declaration* at ¶ 10. Lay directed Branch, Major Kenyan Randle, Major Jeffrey Dean, and EARU and Utility Staff, and others to report to the unit. *Id.*; *Branch Declaration* at ¶ 3.

---

[4] As Emergency Preparedness Administrator, Shores is the leader of the ADC's emergency response department. His role is to monitor all emergency situations for the purpose of providing direction, logistical support, and resource management. One of his duties is to train the ADC's Emergency Response Teams ("ERT"). Each unit has its own ERT. Within the ADC, an emergency response team is a tactical squad that receives additional, special training to prepare to respond to dangerous situations such as prison riots. To serve on an ERT, an officer must be "ERT Certified," meaning the officer must complete a 40-hour tactical response training. This training is in addition to the Basic Correctional Officer Training. Annual recertification is required. *Shores Declaration* at ¶ 3. The ERTs use "less-lethal munitions" when responding to disturbances at the units. Less-lethal munitions are designed to regain control of an inmate or a group of inmates while minimizing the risk of death. Many of them are "crowd management" devices. *Id.* at ¶4.

[5] Central K9 is the ADC's Gang Suppression Taskforce. In addition to its regular duties, Central K9 is also the ADC's quick-reaction force, providing department-wide emergency response services for critical incidents including riots or inmate escapes. Every officer in Central K9 is a CLEST1-certified police officer. Officers must complete annual trainings to maintain their CLEST-certification. *Shores Declaration* at ¶ 2.

15.    Neither Dycus nor Branch made the decision to call for assistance. *Dycus Declaration* at ¶ 12; *Branch Declaration* at ¶ 3.

16.    When Shores was advised that the EARU needed assistance to restore order and control, he activated the Central K9 and called the Pine Bluff Complex and Newport unit and directed them to activate their Emergency Response Teams ("ERTs"). *Shores Declaration* at ¶ 15.

17.    As the Emergency Preparedness Administrator/Major, Shores is in command when he arrives at a unit to respond to a critical incident. *Shores Declaration* at ¶ 38.

18.    Shores and his team arrived at the EARU early on April 14, 2020, and were further briefed on the situation. Shores learned that the disturbance began in 8 Barracks, but that the inmates in 1, 2, and 7 barracks had joined in the disturbance by destroying state property. He also learned that EARU officers could not regain control of 8 barracks because inmates had barricaded the entrance door with a rack and were refusing to surrender. *Shores Declaration* at ¶ 17.

19.    After Shores was briefed, he developed a plan to perform a forced entry into 8 barracks to use if the inmates did not surrender. *Shores Declaration* at ¶ 18; *see also Amended Complaint* at ¶ 19. Shores explained that a forced entry is necessary when inmates have barricaded a door with furniture, or tied the door shut, and the team must physically push its way into the barracks. *Shores Declaration* at

¶ 18.  Some staff were designated to escort inmates to the holding area and maintain security there while other staff searched the barracks.  *Shores Declaration* at ¶¶ 18-19.

20.    Shores and Dycus then reported back to 8 barracks and attempted to resolve the disturbance to no avail.  *Shores Declaration* at ¶ 20; *Dycus Declaration* at ¶ 14; *Amended Complaint* at 20.

21.    Shores maintains that he directed the inmates in 8 barracks to unbarricade the entrance and come into the hallway if they were not involved in the disturbance and advised them that staff would escort them from the area.  Although not all inmates were involved in the disturbance, no inmate attempted to come out of the barracks or otherwise indicated that they would comply with that order according to Shores and Dycus.  *Shores Declaration* at ¶ 20; *Dycus Declaration* at ¶ 15.

22.    Davis disputes that he was given the opportunity to come out of the barracks before chemical spray was deployed.  *Davis Deposition* at 23.  Although he testified that he did not ask to be escorted out of the barracks, he stated:

> The inmates that were not participating in the disturbance never had a chance to surrender, to be escorted out of the barracks or nothing.  We were never given that option.  If you don't have anything to do with this here, you can come on out of the barracks.  We were never given that option.  A couple of inmates went to Major Randle and Warden Dycus and asked could they be escorted out of the barracks, and they said no.

*Id.  See also id.* at 41 & 43 (testifying that Randle witnessed the inmates asking to be let out).

23.    Shores then gave the inmates in 8 barracks a second direct order to catch their racks and allow staff to enter to barracks. *Shores Declaration* at ¶ 21.  Shores explained that the direct order for inmates to catch their racks prior to staff making entry is for the inmates' own safety.  This order is to ensure that the day room area, near the entrance to the barracks, is clear for officers to make entry.  *Id.* at ¶ 23. Davis maintains he remained on his rack. *Amended Complaint* at ¶ 21.

24.    Shores claims he warned the inmates that if they did not comply with this direct order, staff was prepared to deploy non-lethal chemical agents into the barracks to restore order and regain control of the barracks.  Shores says he gave the inmates five minutes to discuss this direct order in hopes that they would decide to comply and avoid the use of any force.  *Shores Declaration* at ¶ 22; *Dycus Declaration* at ¶¶ 16-17.

25.    Davis maintains that the inmates were not warned that chemical spray would be used unless they complied; he refers to officers Hamilton and Padilla's incident reports which do not describe a warning. *See* Doc. No. 77 at 7-9; Doc. No. 78 at 5-8.

26.    According to Shores, none of the inmates involved in creating the escalating disturbance returned to their racks. *Shores Declaration* at ¶ 23.

27.    Five minutes later, Shores returned to 8 barracks in hopes of resolving the disturbance.  However, the inmates had further barricaded the entrance to the barracks and had also flooded the barracks with soap and water.  *Shores Declaration* at ¶ 24.  According to Davis, the rack had been removed from the entrance by then, but someone had dumped trash out and "put the water down with shampoo or something mixed in it to where when the officers came in, they would slip and fall." *Davis Deposition* at 18.

28.    Also at this time, just after 2:00 a.m., the inmates in 7 barracks began to cover the barracks' windows, set a fire in the mail slot of the control booth (which was quickly extinguished), and began breaking windows.  *Shores Declaration* at ¶ 25; *Dycus Declaration* at ¶ 18.  According to Shores, it was critical that staff regain control of the barracks since the situation was escalating.  *Shores Declaration* at ¶ 25.

29.    Inmate Hernandez then advised Shores and Dycus that it was clear his demands were not going to be met and that he was done talking to them.  *Dycus Declaration* at ¶ 19; *Shores Declaration* at ¶ 26.

30.    At approximately 2:18 a.m., Shores authorized the use of non-lethal force to restore order and regain control of 8 barracks, and the plan was initiated. *Shores Declaration* at ¶ 27.  Shores developed the plan and authorized the use of

force at the EARU as the Emergency Preparedness Administrator/Major in command.[6] *Id.* at ¶38.

31.    Dycus and Branch, in their roles as deputy wardens, did not have the authority to authorize this use of force, nor did they attempt to do so. *Dycus Declaration* at ¶ 21; *Branch Declaration* at ¶ 7.

32.    Although Lay called for assistance in regaining control of 8 barracks, he did not authorize the use of the non-lethal force against 8 barracks on April 14, 2020.  Lay does not have firsthand knowledge of what happened during the forced entry into 8 barracks.  Per ADC protocol, Lay could not have been in the area during the forced entry. *Lay Declaration* at ¶ 17.  Davis confirmed that Lay was not present when chemical spray was used. *Davis Deposition* at 19.

33.    Before using chemical agents on April 14, 2020, Stinger grenades[7] were thrown into the barracks to ensure that no inmates spilled out into the hallway when staff made entry. *Shores Declaration* at ¶ 28.  The use of the stinger grenades moved all inmates from near the barracks' entrance.  Many of the inmates in 8 barracks

---

[6] Shores did not personally use physical force during the disturbance at the EARU. He does not carry a weapon of any kind, not even a taser.  Shores is merely there to lead the team and to coordinate the assets on the team, as he did on April 14, 2020. *Shores Declaration* at ¶ 37.

[7] Stinger grenades are made of hard black rubber shells filled with black rubber balls.  Some stinger grenades incorporate a chemical agent, like CS or OC gas. When detonated, the rubber casing explodes rubber balls in a 50-foot radius.  When the rubber balls hit a person, it feels like being stung. *Shores Declaration* at ¶ 8.

moved into the bathroom area. After the inmates had moved from the entrance, Shores' team introduced the chemical agents into 8 barracks. *Shores Declaration* at ¶ 29.

34.    Non-parties Eddie Hamilton, Martin Padilla, and Douglas Swiney were deployed to the outside of 8 barracks. When Shores gave the order, Lt. Hamilton broke out one window on the top tier of 8 barracks and one window on the lower tier of 8 barracks. *Shores Declaration* at ¶ 30.

35.    Shores gave the order to deploy, and Lt. Swiney climbed the ladder and deployed two canisters of CS gas[8] through the broken window on the top tier, and Lt. Padilla deployed two canisters of CS gas through the broken window on the bottom tier. *Shores Declaration* at ¶ 31.

36.    According to Shores, Gas is the safest non-lethal instrument to get inmates to comply with orders and to safely remove them from a barricaded barracks without anyone getting seriously injured. *Shores Declaration* at ¶ 32.

---

[8] According to Shores, CS Gas and OC gas are the two main chemical agents used at the ADC. OC gas is pepper spray and irritant. CS Gas is commonly referred to as tear gas. It mainly affects the respiratory system – it makes a person think he cannot breathe, but he or she can. It also affects the eyes, nose, and sinuses. CS gas is non-lethal, and Shores is not aware of any documented case of a person dying from CS gas exposure. Members of ERTs must complete an annual training exercise in which they are exposed to an extraordinary amount of CS gas, without a gas mask. Shores states that before CS gas is used, inmates are ordered to lie down on their racks and cover their heads. If an inmate lies down and stays calm, an officer will promptly remove him from the area so that he can be evaluated by medical staff, and then be decontaminated. *Shores Declaration* at ¶ 11.

37.    Once the gas was deployed into 8 barracks, more of the inmates in the barracks moved to the bathroom in attempt to escape the gas. *Davis Deposition* at 30. Davis further testified that the inmates knew that chemical agents were going to be used against them. *Id.* at 29. He stated, "they had advised all the inmates to get a wet towel and put a wet towel around your face. That didn't work. So everybody ran to the bathroom area." *Id.* at 29-30.

38.    None of the inmates were combative after the gas was deployed. Shores' team was focused on trying to place restraints on all the inmates and methodically escort them to visitation where they could be identified and receive medical evaluation and treatment. *Shores Declaration* at ¶ 33.

39.    Davis was one of the first five inmates escorted out of 8 barracks. *Davis Deposition* at 26.

40.    Davis was escorted to the visitation area where he was identified and evaluated by medical staff along with other inmates from 8 barracks. *Davis Deposition* at 26. Davis did not report any injuries to medical staff on April 14, 2020, but later reported a chemical burn on his ankle. *Davis Deposition* at 29.

41.    Once staff regained control of the situation, deactivation procedures began. Maintenance made repairs so that inmates could be returned to their barracks as quickly as possible. *Shores Declaration* at ¶ 35.

42.     Neither Dycus, Branch, nor Lay used force against Davis.  *Dycus Declaration* ¶ 23; *Branch Declaration* ¶ 10; *Lay Declaration* ¶ 18.  Davis does not maintain they did; rather, he assumes that Lay, as warden, was in command and gave the final okay to deploy chemical agents.  *Davis Deposition* at 20-21, 24-25.  He sues Dycus and Branch because they were in agreement with that plan.  *Id.* at 23-24.

43.     Davis filed five grievances related to the single remaining claim in this lawsuit.  *See* Doc. No. 47 (Recommendation on Exhaustion) at 8.[9]  The five grievances submitted by Davis named Lay, but only one named Defendants Dycus and Branch.  Doc. No. 63-10 (Grievance No. EA- 20-00609).  In the only grievance naming all the remaining Defendants, Davis grieved merely that Defendants Lay, Dycus, and Branch violated prison policy when they allegedly used non-lethal chemical agents against him without first giving him a warning.  *Id.*  On this grievance, Davis wrote, "The used of force here would have been warranted if the Defendants had followed ADC regulation requiring them to warn Davis before the use of chemical agents, and giving Davis a chance to comply."  *Id.*

---

[9] *See also* Grievance EA-20-00468 (Doc. No. 93-6); Grievance EA-20-00552 (Doc. No. 93-7); Grievance EA-20-00554 (Doc. No. 93-8); Grievance EA-20-00600 (Doc. No. 93-9); and Grievance EA-20-00609 (Doc. No. 93-10).

## IV. Analysis

### A.    *Sovereign Immunity*

Davis' claims against the Defendants in their official capacities are barred by sovereign immunity.  A suit against a state employee in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity.  *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989)*; Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989).  Accordingly, Davis' official capacity claims for money damages[10] should be dismissed.

### B.    *Qualified Immunity*

The Defendants argue that they are entitled to qualified immunity with respect to Davis' individual capacity claims.  Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment.  *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions:

---

[10] Davis does not seek injunctive relief.  *Amended Complaint* at 21.

(1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Davis alleges that he was the victim of excessive force when Defendants authorized or ordered the use of chemical spray on non-combative inmates, including Davis, on April 14, 2020, without warning them beforehand as required by ADC policy.[11] *Amended Complaint* at ¶ 1, 3, 29 & 31. While it is well settled that the unnecessary and wanton infliction of pain violates the Eighth Amendment's prohibition on cruel and unusual punishment,[12] the Court need not evaluate whether

---

[11] Inmates do not have a constitutionally protected right to require prison officials to comply with internal rules or procedures. *See Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (per curiam) (federal grievance regulations providing for administrative remedy procedure do not create liberty interest in access to that procedure). *See also Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003); *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997).

[12] "Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6–7). The use of pepper spray may constitute excessive force if an inmate poses no threat to himself or others. *See e.g.*, *Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008) (use of pepper spray against prisoner

the force used on the morning of April 14 was excessive under the circumstances (with or without a warning and opportunity to comply),[13] because Davis has not established that the Defendants authorized or ordered that chemical spray be used that morning. The law is clear that *respondeat superior* is not a recognized basis for § 1983 liability. *See Keeper v. King*, 130 F.3d 1309 (8th Cir. 1997). To state a cognizable claim against a defendant in a supervisory role, an inmate must allege that the defendant was personally involved in the constitutional violation or became aware of the constitutional violation and, with deliberate indifference, failed to take corrective action. *See, e.g., Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993).

Davis acknowledges in his deposition testimony that Warden Lay was not present in the barracks during the early morning hours of April 14; he merely believes that Lay had the ultimate authority as warden to deploy chemical agents. *See Davis Deposition* at 21 & 24-25. Davis also testified that he holds Deputy Wardens Branch and Dycus accountable merely because they were in agreement with the decision to use chemical agents. *Id.* at 23-24. Finally, Davis has not disputed that it was Shores who ordered chemical spray or controverted the evidence

---

locked in his cell who was refusing to return a food tray presented an Eighth Amendment jury question).

[13] The parties dispute whether or not Davis was warned or provided an opportunity to leave his barracks prior to the use of chemical spray on April 14, 2020. However, these facts are not material where there is no evidence the Defendants were involved in the decision to use force, with or without a prior warning.

provided showing that Shores was in command, and in that role, developed and implemented the use of force plan.  In sum, Davis offers no evidence to prove that any of the Defendants were personally involved in the decision to use chemical agents on the morning of April 14, 2020.  Defendants are therefore entitled to qualified immunity on Davis' claims.

## V.  Conclusion

The Defendants' motion for summary judgment (Doc. No. 93) should be granted, and Davis' claims against them dismissed with prejudice.  Davis' motion for summary judgment (Doc. No. 76) should be denied.

IT IS SO RECOMMENDED this 13th day of December, 2022.

_____
UNITED STATES MAGISTRATE JUDGE